IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWIN GOLDSMITH and : | |
| MARCIA GOLDSMITH, : | |
|    *Plaintiffs*, : | |
| : | CIVIL ACTION |
| v. : | NO. 20-3790 |
| : | |
| OCWEN FINANCIAL CORPORATION, : | |
| OCWEN MORTGAGE SERVICING, : | |
| INC., OCWEN LOAN SERVICING, LLC : | |
| And PHH MORTGAGE CORPORATION, : | |
|    *Defendants*. : | |

### MEMORANDUM

**JONES, II   J.**                                                                                                          **March 3, 2021**

### I.   INTRODUCTION

When the Goldsmiths ("Plaintiffs") purchased their home in Bryn Mawr, PA, they financed the property and secured the financing with a mortgage. Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS"), Ocwen Loan Servicing, LLC ("OLS"), and PHH Mortgage Corporation ("PHH")[1], (collectively, "Defendants") serviced that mortgage. Plaintiffs bring the present action against Defendants, for, *inter alia*: failing to apply Plaintiffs' payments to their loan; charging unauthorized fees for default-related services where there had been no default; failing to maintain accurate account statements; charging unauthorized fees for default-related services where there had been no default; providing false and misleading information to Plaintiffs regarding loan modification; providing false or misleading reasons for the denial of their loan

---

[1] On October 4, 2018, OFC acquired PHH, a mortgage loan servicer. Compl. ¶ 11. Defendants state OFC is a holding company and both OLS and OMS no longer exist. Mot. 2, n. 2. As a result, Defendants argue that PHH is the only appropriate Defendant who had any relationship with Plaintiffs. *Id*. However, Defendants have not moved for dismissal of OFC, OMS, or OLS from the action. Additionally, Plaintiffs state that "OFC, OMS, PHH, and OLS are each jointly and severally liable for the acts and practices" alleged in the Complaint. Compl. ¶ 33. Construing all factual disputes in the light most favorable to the Plaintiff, the Court will assume all listed parties are appropriately Defendants until further motion or discovery suggest otherwise.

modification; misrepresenting to Plaintiffs that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts; and improperly commencing and prosecuting foreclosure proceedings against Plaintiffs.

Defendants have moved for partial dismissal of Plaintiffs' Complaint, specifically Counts II (violation of the Fair Debt Collection Practices Act ("FDCPA"), Count IV (negligence for breach of a contractual duty), and Count VI (tortious interference with an existing contract). Defendants claim they cannot violate the FDCPA because they are not debt collectors. Defendants further state that any negligence claim based upon a breach of a contractual duty would be inappropriate because no contract exists between Defendants and Plaintiffs. Finally, Defendants suggest Plaintiffs cannot bring a tortious interference claim because Defendants had no knowledge of any third-party contract and, even if they did, Defendants were justified in intervening. For the reasons outlined below, Defendants' Motion for Partial Dismissal [hereinafter Motion] (ECF No. 2) is granted and denied in part.

## II. STATEMENT OF FACTS

When Plaintiffs purchased their residential home, they financed the property and secured the financing with a mortgage loan. Compl. ¶¶ 1-2. Their loan was one of many loans pooled together in a trust called "J.P. Morgan Mortgage Acquisition Corp. 2005-OPT1, asset-backed pass-through certificate series 2005," with an aggregate principal balance of more than $1 billion. Compl. ¶ 41. The trustee for this trust is U.S. Bank National Association, and, typically, the trustee engages a mortgage servicer to service the pooled loans. Compl. ¶¶ 42-43.

Mortgage servicers provide a variety of functions, including, but not limited to: (1) loan processing, (2) applying borrower payments, (3) communicating accurate payment information to borrowers, (4) managing escrow accounts, (5) maintaining accurate loan balance information, (6) responding to borrower inquiries, (7) handling loss mitigation requests, and (8) initiating

foreclosure proceedings. Compl. ¶¶ 44-45. To perform these tasks, servicers input loan and borrower information into electronic databases, often called systems of record. Compl. ¶ 46. If the servicer inputs inaccurate information into the system of record, or if the system itself has deficiencies, a mortgage servicer can make critical errors that harm borrowers. Compl. ¶ 48. At all times relevant, Defendants acted as the mortgage servicer for Plaintiffs' loan. Compl. ¶ 49.

### A.  Plaintiffs' Presently Mortgaged Property

On March 15, 2005, Plaintiffs delivered to Option One Mortgage Corporation the note and mortgage at issue in this action, which according to Defendants, was ultimately assigned to them for servicing. Compl. ¶ 56. The note identifies a monthly payment amount of $3,783.84 and matures by its terms on April 1, 2035. Compl. ¶¶ 57-58.

From 2005-2015, Plaintiffs paid the real estate taxes on their home directly to the taxing authority without any concern or interference from the mortgagee; pursuant to the loan documents, Plaintiffs were not required to put any money into escrow for payment of these taxes. Compl. ¶ 61. Plaintiffs' payment plans changed on May 19, 2016 when they entered into an installment agreement with the Montgomery County Tax Bureau ("Montgomery County") whereby they agreed to pay their 2015 real estate taxes in five (5) installments, with the final payment being made on or about May 19, 2017. Compl. ¶ 62. Plaintiffs claim they continued to pay the real estate taxes in these installment amounts. Compl. ¶ 63.

### B.  Defendants Begin Paying Plaintiffs' Real Estate Taxes

Without Plaintiffs' knowledge, on May 25, 2017, Defendants paid $30,020.97 in real estate taxes on Plaintiffs' property to the Lower Merion School District for the first time since Plaintiffs got their mortgage loan in 2005. Compl. ¶ 64. Defendants claim they did this because Plaintiffs' tax records showed they owed a total of $30,020.97 in taxes, despite mention of an "[a]greement

installment amount" of $4,120.18 actually being paid. *See* Tax Records[2], Attached to Mot. as Ex. A [hereinafter Ex. A].[3]  Without inquiring into this installment amount or notifying Plaintiffs, again, on July 12, 2017, Defendants paid the township tax of $6,237.00.  Compl. ¶ 65.  On August 16, 2017, Defendants paid the Lower Merion School District tax of $17,716.91, and, once more, Defendants did not give Plaintiffs notice of this transaction.  Compl. ¶ 66.

Having not told Plaintiffs about any of these payments, Defendants sent Plaintiffs a billing statement dated August 17, 2017 claiming an amount due of $20,813.98 (when the usual monthly payment was $3,798.84), of which, $5,353.46 was required to be put in escrow (when Plaintiffs' original note never required them to put any money into escrow).  Compl. ¶ 68.  In addition to these immediate amounts owed, as of September 1, 2017, Plaintiffs' monthly payment amount would increase to $9,137.30.  Compl. ¶ 69.  The next day, August 18, 2017, Defendants issued a late payment notice claiming Plaintiffs now owed $10,421.49, of which $6,410.62 was for escrow purposes.  Compl. ¶ 70.

Less than one month later, on September 15, 2017, Defendants issued a notice of default claiming Plaintiffs now needed to pay two months' worth of principal and interest ($7,567.68, based upon the original $3,783.84 monthly price), and an additional $11,764.00 for escrow by October 22, 2017.  ¶ 72.  Because they were unaware of any of Defendants' payments, Plaintiffs

---

[2]  Plaintiffs suggest the Court cannot rely on their tax records at the pleadings phase. Response in Opposition 12-13.  The Court disagrees.  The Third Circuit has made clear that, "[a]lthough the court is generally limited in its review to the facts contained in the complaint, it may also consider **matters of public record**, orders, exhibits attached to the complaint and items appearing in the record of the case." *McBride v. Warden of Allegheny Cty. Jail*, 577 F. App'x 98, 99 (3d Cir. 2014) (emphasis added) (citing *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).  Public records include Real Property Tax Assessor and Transaction Records in Pennsylvania.  *In re Tippet*, No. 03-1017, 2004 WL 2495405, at *3 n. 9 (Bankr. E.D. Pa., Oct. 28, 2004) (citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)).  Because Defendants' proposed exhibit is a public tax record, the Court will consider it for purposes of their Motion.

[3] The Court recognizes that while Plaintiffs' list the exhibits attached to their Complaint in numerical order, Defendants label the exhibits attached to their Motion alphabetically.  For purposes of this Motion, the Court will proceed with the labels originally identified by the parties.

were surprised to receive any default notice when they had paid, and Defendants had received, payments of principal and interest (in the amount of $3,783.84) for June, July, and August of 2017. Compl. ¶ 73. After sending the notice, Defendants continually made repeated and unwanted debt collection calls to Plaintiffs directly, even after being advised that Plaintiffs were represented by counsel, Jeffrey Engle, Esquire. Compl. ¶ 74. In at least one letter dated October 11, 2017, Plaintiffs not only advised Defendants of their representation by counsel but also made Defendants aware that they had interfered with the Plaintiffs' agreement with Montgomery County and were improperly charging not only higher rates but also escrow amounts in violation of their initial note. Compl. ¶¶ 76-77. The letter ended by Plaintiffs demanding Defendants to remove the negative credit items on their account. Compl. ¶ 77.

Despite Plaintiffs' demands, in March and August of 2018, Defendants, without notice, again paid Plaintiffs' real estate taxes (including the township and school tax). Compl. ¶¶ 77, 79. This payment included the 2016, 2017, 2018, and a portion of the 2019 real estate taxes, before Plaintiffs had an opportunity to make these payments. Compl. ¶ 80. Plaintiffs first became aware of all of Defendants' payments when they contacted Montgomery County to pay their 2016 real estate taxes. Compl. ¶ 83.

  **C. Defendants Begin a Mortgage Foreclosure Action**

On December 27, 2018, Defendants filed a mortgage foreclosure action against Plaintiffs in the Court of Common Pleas ("CPP") of Montgomery County, PA (Case No. 2018-29783), claiming that Plaintiffs' mortgage was in default because the monthly payments for principal and interest were unpaid for the month of September of 2017 and every month thereafter. Compl. ¶¶ 89-90; CPP Complaint Attached to Complaint as Exhibit 6. In their Answer, Plaintiffs denied that the mortgage was in default because they made all payments of principal and interest to Defendants in the form of the initially agreed upon amount ($3,783.84). Compl. ¶ 93; CPP Answer Attached

to Complaint as Exhibit 7.  In reply to Plaintiffs' Answers, Defendants also admitted they received these checks for all the months listed in their Complaint.  Compl. ¶ 97; CPP Reply Attached to Complaint as Exhibit 8.

Nearly two (2) months after Defendants filed these foreclosure proceedings, Defendants sent Plaintiffs a letter dated February 25, 2019.  Compl. ¶ 106.  At the bottom of every page of the letter, Defendants state, "[t]his communication is from a debt collector attempting to collect a debt; any information obtained will be for that purpose."  February 25, 2019 Letter Attached to Complaint as Exhibit 9 [hereinafter Ex. 9].  Defendants advised Plaintiffs that their account was approved for a Trial Period Plan where Plaintiffs' monthly payments would now be $5,281.99 (substantially less than the disputed amounts Defendants claimed was due) with an increased interest rate from 4.37% to 9.5%.  Compl. ¶¶ 106, 111; Ex. 9.  In an effort to mitigate any harm, Plaintiffs agreed to this modification.  Compl. ¶ 110.

To begin the process of modifying their loan, Plaintiffs had to sign and return a copy of the "Mortgage Assistance Acceptance Form" and make three trial payments of $5,281.99 by April 1, 2019, May 1, 2019, and June 1, 2019, respectively, and Plaintiffs claim they did so.  Compl. ¶¶ 113-114.  Defendants then needed to deliver to Plaintiffs a "Permanent Modification Agreement," which each of the parties would need to sign before the loan was permanently modified, but neither Plaintiffs nor their counsel received this final agreement.  Compl. ¶¶ 116-118.  Instead, Plaintiffs received a letter on September 18, 2019; at the bottom of every page of the letter, Defendants list a disclaimer that "[this communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose."  September 18, 2019 Letter Attached to Complaint as Exhibit 11 [hereinafter Ex. 11].  The letter went on to advise Plaintiffs that they were "no longer eligible for the loan modification offer" because they had "failed to return the final

modification agreement within the required timeframe." Compl. ¶ 119; Ex. 11. Plaintiffs state they were never made aware of any deadline and still had not received the final modification agreement. Compl. ¶¶ 122-123.

After revoking the modification offer, Defendants advised Plaintiffs that they may be eligible for a short sale or deed in lieu of foreclosure, and, as of date, Defendants continue to pursue Plaintiffs in their foreclosure action. Compl. ¶¶ 126-128. In the meantime, Defendants have accelerated all amounts purportedly due under the note and demanded payment in full. Compl. ¶ 129.

### D.  Similar Claims Against Defendants

This is not the first time Defendants have allegedly harmed their borrowers as a mortgage servicer. On April 20, 2017, in a separate action, the Consumer Financial Protection Bureau ("CFPB") filed a 318-paragraph complaint against Defendants "for failing borrowers at every stage of the mortgage servicing process," for "years of widespread errors, shortcuts and runarounds" which "cost some borrowers money and others their homes" and for having "botched basic functions like sending accurate monthly statements, properly crediting payments and handling taxes and insurance." Compl. ¶ 54; CFPB's Press Release, Attached to Complaint as Exhibit 2. These allegations mirror Plaintiffs' present claims.

### III.   PROCEDURAL HISTORY

On June 30, 2020, Plaintiffs commenced this action against Defendants in the Court of Common Pleas of Montgomery County, PA. *See* Notice of Removal, ECF NO. 1, ¶ 1. Plaintiffs filed a (7) Count Complaint, of which Counts II, IV and VI are at issue today. On August 5, 2020, Defendants removed the action to the United States District Court for the Eastern District of Pennsylvania based on both federal question and diversity jurisdiction. Notice of Removal ¶¶ 6-7, 17-25. One week later, on August 12, 2020, Defendants filed the present Partial Motion to

Dismiss for Failure to State a Claim under Fed. R. Civ. P. 12(b)(6). ECF No. 2. Plaintiffs filed a Response in Opposition to said Motion on August 26, 2020. ECF No. 5. Defendants then submitted a Reply Brief in Further Support of their Motion on September 4, 2020. ECF No. 9. The Motion to Dismiss is thus ripe for this Court's review.

**IV.   STANDARD OF REVIEW**

Rule 12(b)(6) provides for dismissal of a complaint, in whole or in part, for failure to state a claim upon which legal relief can be granted. In deciding a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 318 (3d Cir. 2008) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). While these claims do not require detailed facts, "a complaint must do more than allege the plaintiff's entitlement to relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). A complaint must "show" the plaintiff is entitled to relief. *Id.* (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234-235 (3d Cir. 2008)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Courts reviewing a motion to dismiss pursuant to Rule 12(b)(6) must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *See Phillips*, 515 F.3d at 233 (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2008)); *see also Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). In the Third Circuit, the Court's review "is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the

elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate when, even assuming all of plaintiff's claims as true, plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. If a plaintiff does not "nudge [his/her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id*.

## V.     DISCUSSION

### A.  Count II: Plaintiffs' FDCPA Claim

Pursuant to the FDCPA, 15 U.S.C. § 1692, debt collectors are prohibited from engaging in deceptive, abusive, or otherwise unfair practices to collect debts. To successfully bring an FDCPA claim, Plaintiffs must prove the following: (1) they are consumers; (2) Defendants are debt collectors; (3) Defendants' relevant activity involves an attempt to collect a debt as defined by the FDCPA; and (4) the Defendants have violated the FDCPA in attempting to collect the debt. *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 265 (3d Cir. 2019) (internal citation omitted).

Defendants challenge Plaintiffs' claim by asserting that they are not debt collectors. Plaintiffs dispute this and point to Defendants' demands for payment, default notices, harassing phone calls, and the fact that Defendants' own correspondence identifies Defendants as debt collectors. Having reviewed the evidence in the light most favorable to the Plaintiffs, the Court finds sufficient facts to suggest Defendants could be debt collectors under the FDCPA.

"The FDCPA provides two alternative definitions of a debt collector: (1) any person 'who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts' (the 'principal purpose' definition), or (2) any person 'who regularly collects or attempts to collect, directly or indirectly, debts owed or due or

asserted to be owed or due to another' (the 'regularly collects' definition)." *Stone v. JPMorgan Chase Bank, N.A.*, 415 F. Supp. 3d 628, 632 (E.D. Pa. 2019) (quoting *Barbato*, 916 F.3d at 265); 15 U.S.C. § 1692(a)(6).

The Third Circuit has found that that any "entity that has the 'collection of any debts' as its 'most important' 'aim' is a debt collector" under the "principal purpose" definition. *Barbato*, 916 F.3d at 267 (quoting 15 U.S.C. § 1692(a)(6)). However, the Third Circuit has contrasted this definition with those of a "traditional creditor, such as a bank...for which debt collection is one of the many parts of its business." *Id*. at 268-269.

Though it is well-settled that "not all mortgage servicers are *per se* debt collectors, this does not mean that no mortgage servicer can be a debt collector." *Rivera v. Bayview Loan Servicing*, No. 19-877, 2020 WL 1508328, at *5 (E.D. Pa. Mar. 30, 2020). In *Rivera*, this District found sufficient facts to suggest the defendant was a debt collector. To support this conclusion, the Court considered how the defendant: (1) buys and services debts; (2) admits in its letters that it is a debt collector; and (3) sent plaintiff monthly statements to discuss the status of her payments. *Id*. Defendants attempt to distinguish the present case from *Rivera* by noting how they have not purchased Plaintiffs' debt at any point. Reply Brief 2. While the Court agrees that no evidence has suggested this, the Court cannot ignore that other factors considered in *Rivera* are present in this case and point to Defendants being debt collectors.

First, the Court cannot ignore that in multiple pages of correspondence sent from Defendants to Plaintiffs, they identify themselves as debt collectors. In fact, Defendants clearly state, "[t]his communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose." *See* Exs. 9, 11. Plaintiffs echo this sentiment when, in their Complaint, Plaintiffs note that "Ocwen...acquires and collects upon borrowers' mortgage

debts that are in default." Compl. ¶¶ 17-18. Accordingly, both Plaintiffs and Defendants have clearly labeled Defendants as debt collectors.

In addition to being called debt collectors, Defendants also acted like debt collectors when they sent correspondence to Plaintiffs requesting payment of a debt. "A party attempts to collect a debt when it performs an 'activity undertaken for the general purpose of inducing payment.'" *Rivera*, 2020 WL 1508328, at *5 (quoting *McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 245 (3d Cir. 2014)). Defendants' correspondence does not need to contain an explicit demand for payment if they can at least be plausibly seen to discuss the status of the parties' payments. *Id*.

Plaintiffs state that, "without any notice to the borrowers, [Defendants] turned around and purported to substantially increase [Plaintiffs'] monthly payments, and demand enormous lump sum payments, claiming thousands of dollars more were purportedly due for purposes of funding an 'escrow.'" Compl. ¶ 67. Additionally, Plaintiffs assert that Defendants made repeated debt collection calls, even after being advised that Plaintiffs were represented by counsel. Compl. ¶ 74. Considering these statements, it is plausible that Defendants' communications could have been for the purpose of inducing payment.

Defendants cite to other cases from this District where courts have ruled that a company who services a mortgage is not a debt collector; however, those cases are inapplicable to the facts present here. In *Gernhart v. Specialized Loan Servicing, LLC*, the defendant was solely acting in the capacity of a mortgage servicer, not as a debt collector, as Defendants have here. No. 18-2296, 2019 WL 1255053, at *3-4 (E.D. Pa. Mar. 18, 2019). Additionally, the defendant in *Morgan v. Bank of America, N.A.*, could not be considered a debt collector as defined by the

FDCPA because Bank of America was the creditor attempting to collect under its own name. No. 18-3671, 2019 WL 1332179, at *5 (E.D. Pa. Mar. 25, 2019).

The Court finds it entirely unpersuasive for Defendants to identify themselves as debt collectors in all correspondence to Plaintiffs, make Plaintiffs think they are debt collectors, and then perform the actions of a debt collector, only to now argue to this Court that mortgage servicing companies have not been traditionally considered debt collectors under the FDCPA. Considering all the allegations and facts presented, Plaintiffs have pleaded sufficient evidence to suggest Defendants were a debt collector, and the Court will not dismiss Count II at this early pleadings stage.

### B. Count IV: Plaintiffs' Negligence Claim

Plaintiffs presently bring a negligence claim alleging Defendants owed them a duty to "engage in reasonable conduct" when servicing their loan. Compl. ¶ 175. Defendants retort that this claim fails as Plaintiffs do not point to any common law duty for one party to service another's mortgage loan. Mot. 9-11. Plaintiffs fail to rebut this point and only reiterate that there is no contractual relationship between the parties. Response in Opposition 10. Because both parties state that no contractual duty exists between them, the Court will disregard this argument. Based on the information provided, the Court agrees with Defendants that Plaintiffs' negligence claim must be dismissed.

To bring a successful negligence claim, Plaintiffs must establish four elements: "1) the defendant owed the plaintiff a duty; 2) the defendant breached the duty; (3) the plaintiff suffered actual harm; and 4) a causal relationship existed between the breach of duty and the harm." *Adams v. Wells Fargo Bank, N.A.*, No. 16-0907, 2017 WL 6619015, at *2 (E.D. Pa. Dec. 17, 2017). In this case, the parties dispute whether Defendants owed Plaintiffs a duty. In their

Complaint, Plaintiffs claim Defendants owed them a duty to engage in "reasonable conduct" in servicing their loan.  However, Plaintiffs cite to no authority to support this contention.  *Id*.

As a result, Plaintiffs have failed to present a plausible prima facie negligence claim.  The Court agrees with Defendants that Count IV of the Plaintiffs' Complaint should be dismissed in accordance with Federal Rule of Civil Procedure 12(b)(6).

### C.   Count VI: Plaintiffs' Tortious Interference Claim

Plaintiffs bring a claim of tortious interference arguing that Defendants interfered in Plaintiffs' contractual relationship with Montgomery County.  Defendants dispute this claim for two, independent reasons.  First, because Defendants were unaware that a contract between Plaintiffs and Montgomery County ever existed, it is not possible to show Defendants possessed the specific intent required for a tortious interference claim.  Second, Defendants claim that Plaintiffs have failed to meet their burden in showing that Defendants paying delinquent taxes was not justified.  Having reviewed all the filings and pleadings, the Court finds Plaintiffs' argument to be persuasive.

To prove a claim of tortious interference with existing or prospective contractual relationships under Pennsylvania law, a party must prove five elements: "(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, **specifically intended to harm an existing relationship** or intended to prevent a prospective relation from occurring; (3) the **absence of privilege or justification on the part of the defendant**; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 140 F.3d 199, 212 (3d Cir. 2009) (emphasis added) (citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 630 (3d Cir. 1998).  Of concern

in this case is the second and third elements as Defendants claim they never knew about the contractual relationship between Plaintiffs and Montgomery County, or, even if they did, they were justified in intervening by paying delinquent taxes.

### 1. Intent to Harm an Existing Relationship

A party intends to cause harm when "the actor knows an injury is certain or substantially certain to occur as a result of his action." *Lawson v. CSX Corp.*, No. 98-3539, 1999 WL 778315, *4 (E.D. Pa. Sept. 30, 1999) (citation omitted). "An actor cannot know an injury is certain or substantially certain to occur when he does not know of the existence of a contractual relationship." *Id*.

Defendants suggest they could not have possessed the intent to damage Plaintiffs' contractual agreement with Montgomery County because they did not know this arrangement existed. However, attached to Defendants' Motion to Dismiss, they provide a copy of Plaintiffs' online tax records. *See* Ex. A. This is a true an accurate copy of Plaintiffs' tax records which Defendants state they noticed on May 22, 2017, just before they began paying Plaintiffs' real estate taxes on May 25, 2017. Response in Opposition 3-4. Though Defendants claim they had no prior knowledge of Plaintiffs' contractual agreement to pay their real estate taxes in installment amounts, the tax statements explicitly show that, while Plaintiffs owed a total of $30,020.97 in taxes, they had paid an installment amount of $4,120.18. Ex. A. The tax statement also makes clear reference to this "[a]greement installment amount," which could have plausibly put Defendants on notice of an agreement between Plaintiffs and a third-party. *Id*. Accepting all allegations as true and construing reasonable inferences in the light most favorable to the Plaintiffs, this Court finds sufficient evidence that Defendants could have had knowledge of the agreement between Plaintiffs and Montgomery County.

Because the Court finds that Plaintiffs pleaded sufficient evidence to suggest Defendants had knowledge about their agreement with Montgomery County, the Court must next determine if there is sufficient evidence to show Defendants acted with the specific intent to harm an existing relationship. The Court finds that Plaintiffs have met this burden. In their Complaint, Plaintiffs state, "Ocwen has sought to profit from its unwarranted payment of the real estate taxes by charging the Goldsmiths for various fees and other expenses which it claims are due as result." Compl. ¶ 87. This fact coupled with Defendants seemingly ignoring any indication of Plaintiffs' relationship with Montgomery County is sufficient at the pleadings stage for the Court to find it plausible that Defendants acted with the specific intent to harm Plaintiffs' contract.

### 2. Privilege or Justification on the Part of Defendants

Defendants alternatively suggest Plaintiffs' tortious interference claim still fails because Defendants were justified or privileged in paying delinquent taxes as a contractual right. Mot. 13. Plaintiffs respond that, even if Defendants did have this contractual right, this is a factual issue that is not properly resolved at the pleading stage without any discovery. Plaintiffs' Response in Opposition 15. Considering the facts presented and the caselaw cited by both parties, the Court agrees with Plaintiffs.

"[T]o recover on a tortious intentional interference with existing or prospective contractual relationships in Pennsylvania, a plaintiff must prove that the defendant was not privileged or justified in interfering with its contracts[.]" *Acumed LLC*, 561 F.3d at 214. A party is privileged or justified to interfere in the contract of another when: "(1) the actor has a legally protected interest; (2) he acts or threatens to act to protect the interest; and (3) the threat is to protect it by proper means." *Ruffing v. 84 Lumber Co.*, 600 A.2d 545, 548 (Pa. 1991). Accordingly, "'[o]ne who, by asserting in good faith a legally protected interest of his

own...intentionally causes a third person not to perform an existing contract...does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.'" *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 395 (3d Cir. 2000) (quoting Restatement (Second) of Torts § 773).

Here, Defendants claim they had an "absolute contractual right" to protect their collateral by paying reportedly delinquent taxes. Mot. 13. Plaintiffs dispute this point and suggest Defendants had no reason to pay the taxes because their collateral was never in jeopardy while Plaintiffs were paying the taxes pursuant to an installment agreement. Plaintiffs' Response in Opposition 15; Compl. ¶¶ 61-82. Though Defendants cite to multiple cases where courts determined that parties had legitimate reasons to interfere in contractual relationships, Plaintiffs correctly note that all of these decisions were made at the summary judgment or trial phases, after the benefit of fully completed discovery. Plaintiffs' Response in Opposition 15-16. *See Acumed LLC*, 561 F.3d at 220 (Finding that the District Court erred in allowing appellee's tortious interference claim to proceed to the jury when a judgment as a matter of law was the appropriate means to handle the claim); *Crivelli*, 561 F.3d at 395-396 (Holding the District Court should have granted appellant's judgment as a matter of law for plaintiff's tortious interference claim); *Acclaim Sys. v. Infosys. Ltd.*, No. 13-7336, 2016 WL 974136, at *1 (E.D. Pa. Mar. 14, 2016) (Moving for summary judgment on the plaintiff's tortious interference claim); *Mylan Inc. v. SmithKline Beecham Corp.*, No. 10-4809, 2012 WL 603804, at *7 (D.N.J. Feb. 23, 2012) ("As [the plaintiff] cannot demonstrate the first element of its tortious interference claim, summary judgment against it is appropriate."). At the present pleadings stage, this Court finds Plaintiffs have pleaded sufficient facts to suggest Defendants were not justified or privileged in paying Plaintiffs' real estate taxes.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' Count IV tortious interference claim is denied.

## VI. CONCLUSION

For the reasons outlined above, Defendants' Partial Motion for Dismissal is denied in part and granted in part. Accordingly, Count IV of Plaintiffs' Complaint is Dismissed. Should Plaintiffs' wish to amend their complaint, they will have thirty (30) days to do so.

An appropriate Order follows.

BY THE COURT:

*/s/ C. Darnell Jones, II*
C. DARNELL JONES, II     J.