## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| EDWIN GOLDSMITH and MARCIA GOLDSMITH, <br><br>         *Plaintiffs,* <br><br>     v. <br><br><br> OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC., OCWEN LOAN SERVICING, LLC, and PHH MORTGAGE CORPORATION, <br><br>         *Defendants*. | CIVIL ACTION <br> NO. 20-3790 |

**Pappert, J.**                                                             **June 25, 2026**

### <u>MEMORANDUM</u>

In 2015, Edwin and Marcia Goldsmith failed to pay property taxes as their mortgage required.  After warning the Goldsmiths about the consequences of their delinquency, defendants paid roughly $30,000 in past due taxes directly to the taxing authority.  The Goldsmiths' mortgage payment nearly tripled to cover the taxes defendants paid on their behalf.  When the Goldsmiths failed to pay their increased monthly bills in full, defendants began foreclosure proceedings.

To resolve their past due mortgage payments and avoid foreclosure, defendants offered the Goldsmiths a modified mortgage agreement.  The deal required the Goldsmiths to make three "trial" payments before they could accept a permanent agreement.  They made the three payments but contend defendants never sent them a permanent agreement, preventing them from finalizing the deal.  The Goldsmiths, believing defendants interfered with an installment payment agreement they had

1

struck with the taxing authority and deceived them by failing to mail the agreement before time ran out to sign it, sued defendants, alleging common law fraud, abuse of process, tortious interference, conversion, unjust enrichment and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law and Fair Debt Collection Practices Act.  Defendants moved for summary judgment on all claims.

The parties dispute material facts as to the Goldsmiths' UTPCPL and fraud claims.  Notably, a reasonable jury could conclude defendants intentionally sent the Goldsmiths a modified mortgage agreement after the deadline to sign it had already passed, preventing them from accepting the deal.  The Court denies defendants' motion in part and grants it in part.

I

A

The Goldsmiths own a home in Bryn Mawr subject to a 2005 mortgage serviced by defendants.[1]  (Defs.' SOMF ¶¶ 1–2, Dkt. No. 85-2.)  The loan was for $450,000.00 at

---

[1]    Various companies have serviced the mortgage.  The Goldsmiths generally refer to these entities as "defendants."  Defendants argue PHH Mortgage Corporation is the only proper defendant because (1) Ocwen Loan Servicing, LLC no longer exists after it merged with PHH, (2) Ocwen Mortgage Servicing, Inc. merged into a company which is not a party to this lawsuit and (3) Ocwen Financial Corporation is "simply a holding company."  (Defs.' Mot. for Summ. J. at 2, Dkt. No. 85-3.)  Defendants offer evidence only as to Ocwen Loan Servicing, LLC.  (Feezer Dep. at 10:10–23, Defs.' Ex. B, Dkt. No. 85-6); (Defs.' SOMF ¶ 4.)  The Goldsmiths adduce no contrary evidence.  Ocwen Loan Servicing, LLC is not a proper defendant.  *See* Pa. Stat. and Cons. Stat. Ann. § 336 (a)(2), (4); *see also Educ. Soc. of Yozgad v. Gordon*, 166 A. 499, 500 (Pa. 1933) ("[A]fter merger the constituent corporation ceases to exist, and consequently should not be made defendant in an action when all the merged properties are in the consolidated corporation.").

But defendants point to no evidence to support their arguments as to Ocwen Mortgage Servicing, Inc. or Ocwen Financial Corporation.  Instead, they reference other courts' decisions to support their factual claims.  (Defs.' Mot. for Summ. J. at 2.)  On this record the Court cannot dismiss Ocwen Mortgage Servicing, Inc. or Ocwen Financial Corporation from the case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")  The Court will resolve this issue

9.5 percent interest, and initially the Goldsmiths' monthly payment was $3,783.84. (Goldsmiths' SOMF ¶ 10, Dkt. No. 88-1); (Edwin Goldsmith Dep. at 98:12–16, Defs.' Ex. A, Dkt. No. 85-5); (Note, Goldsmiths' Ex. B, Dkt. No. 88-4 at 6.)  The mortgage is non-escrowed—the Goldsmiths must pay property taxes directly, as opposed to an escrowed mortgage under which the loan servicer collects additional monthly payments and pays taxes on the borrowers' behalf.  (Defs.' SOMF ¶¶ 2, 5, 7, 9); (Goldsmiths' SOMF ¶ 6.)

The Goldsmiths did not timely pay their 2015 property taxes.  (Defs.' SOMF ¶ 8); (Goldsmiths' SOMF ¶¶ 13–14.)  On May 19, 2016, Edwin Goldsmith agreed to pay the Montgomery County Tax Claim Bureau five quarterly installments totaling $21,974.30. (Goldsmiths' SOMF ¶ 16); (Payment Plan, Goldsmiths' Ex. I, Dkt. No. 88-4 at 93.)  The Goldsmiths made some scheduled payments, (Goldsmiths' SOMF ¶ 17), but by May of 2017 they owed $30,020.97 in delinquent taxes for 2015 and 2016, (Parcel Search Result, Goldsmiths' Ex. P, Dkt. No. 88-4 at 284).

The Goldsmiths' mortgage permits the lender to pay delinquent property taxes. (Defs.' SOMF ¶ 6.)  After purportedly notifying the Goldsmiths twice that their taxes were delinquent, defendants paid the taxing authority $30,020.97.  (*Id.* ¶¶ 14, 16, 19–20.)  As a result, they increased the Goldsmiths' monthly payment to $10,194.46 then adjusted it to $9,137.30 after the taxing authority returned $3,073.20 to them.  (*Id.* ¶¶ 20–22.)  Nonetheless, the Goldsmiths continued to pay $3,783.84 per month.  (*Id.* ¶ 23.) Defendants accepted three such payments then rejected all subsequent payments for that amount.  (*Id.* ¶¶ 24–25.)

---

before trial, either through a stipulation by the parties or deciding a properly supported motion.  The Court thus, for now, refers to the mortgage servicers collectively as "defendants."

Defendants filed a foreclosure complaint against the Goldsmiths in the Montgomery County Court of Common Pleas in December of 2018.  (*Id.* ¶ 27.)  Then they offered the Goldsmiths a temporary loan modification "which would have resolved Plaintiffs' past due status."  (*Id.* ¶ 28.)  The Goldsmiths accepted the temporary loan modification by signing it and making three "trial period payments."  (*Id.* ¶¶ 28–29.)  Defendants were obligated to send the Goldsmiths a final modification agreement that would permanently adjust their mortgage, resolving their payment delinquency.  (Goldsmiths' SOMF ¶¶ 89, 90–93.)  The parties dispute whether defendants ever sent it: defendants claim they sent a letter containing the final modification agreement on July 3, 2019, (Defs.' SOMF ¶ 30), but the Goldsmiths argue they received no such letter and point to evidence the letter was not sent until July 26, 2019, (Goldsmiths' SOMF ¶¶ 99 & 101).  In any event, the Goldsmiths did not sign the permanent modification agreement or return it by the July 21, 2019 deadline and defendants never again offered the Goldsmiths the modification.  (Defs.' SOMF ¶¶ 30–32); (Goldsmiths' SOMF ¶ 103.)

B

The Goldsmiths filed this lawsuit in June of 2020 in the Montgomery County Court of Common Pleas alleging violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count I), the Fair Debt Collection Practices Act (Count II), fraud (Count III), negligence (Count IV), abuse of process (Count V), tortious interference (Count VI), conversion and unjust enrichment, (Counts VII & VIII).  (Compl., Dkt. No. 1-1.)  Defendants removed the case and filed a partial motion to dismiss.  (Dkt. Nos. 1 & 2.)  Judge Jones, then presiding over the case, dismissed the

4

Goldsmiths' negligence claim. (Dkt. Nos. 12 & 13.) The case was transferred to Judge Brody on November 17, 2022. (Dkt. No. 29.) In August of 2025, defendants moved for summary judgment on all claims against them. (Dkt. No. 85.) The case was reassigned to this Court on April 2, 2026. (Dkt. No. 110.)

## II

Federal Rule of Civil Procedure 56 directs a district court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This language compels judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A nonmoving party fails to satisfy this standard if "the record taken as a whole could not lead a rational trier of fact to find" in his favor. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks and citation omitted). The nonmoving party must identify "specific facts, as opposed to general allegations," establishing each element of his claim. 10A *Wright & Miller's Federal Practice & Procedure* § 2727.2 (4th ed. 2016). In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009).

III

A

The Goldsmiths contend defendants' payment of their delinquent taxes interfered with their payment plan with the Montgomery County Tax Claims Bureau. To establish a claim of tortious interference, they must show

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Acumed LLC v. Advanced Surg. Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009). Defendants argue the Goldsmiths' claim fails because (1) they were justified in paying the Goldsmiths' taxes and (2) they did not intend to harm the Goldsmiths' relationship with the taxing authority.  (Defs.' Mot. for Summ. J. at 3.)

1

The Goldsmiths' mortgage agreement states "[i]f Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property . . . then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property."  (Mortgage Agreement ¶ 7, Defs.' Ex. C, Dkt. No. 85-7.) Defendants acted on the lender's behalf when they paid the outstanding property taxes. (Defs.' SOMF ¶ 6.)  They were legally privileged to preserve their interest in the property and therefore cannot be liable for tortious interference.  *See Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 395 (3d Cir. 2000) (citing *Ruffing v. 84 Lumber Co.*, 600

6

A.2d 545, 548 (Pa. Super. Ct. 1991)); *see also In re Sims*, 358 B.R. 217, 226 & n.7 (Bankr. E.D. Pa. 2006) (referencing a similar mortgage provision and explaining "[m]any residential mortgages authorize mortgage lenders to make advances for delinquent taxes").

The Goldsmiths offer no evidence to support their position that defendants, as mortgage servicers, were somehow not authorized to act on behalf of the lender. *See* (Feezer Dep. at 24:2–19). They suggest without legal support that their separate escrow account agreement "does not include agents acting on behalf of Lender." (Goldsmiths' Resp. in Opp'n at 7, Dkt. No. 88-2.) But they do not dispute that the mortgage agreement permits defendants to make tax payments on the lender's behalf, *see* (Defs.' SOMF ¶ 6), and fail to explain how or why the escrow agreement makes any difference, *see Fireman's Ins. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) ("[A] party resisting [a motion for summary judgment may not] rely merely upon bare assertions, conclusory allegations or suspicions."). Finally, the Goldsmiths claim defendants' conduct was inconsistent, apparently because they could have paid the delinquent taxes sooner but elected not to. (Goldsmiths' Resp. in Opp'n at 9.) All of this is immaterial. The Goldsmiths do not dispute their property taxes were delinquent when defendants paid them nor that the mortgage agreement permitted such payments to protect the lender's rights in the property. *See* (Edwin Goldsmith Dep. at 26:22–27:19.)

2

The Goldsmiths next claim defendants intended to interfere because they "had knowledge that the Property was subject to an installment payment plan" when they

paid the delinquent taxes. (Goldsmiths' Resp. in Opp'n at 10.) They rely on "a screenshot of the payment screen from the [Montgomery County Tax Claim Bureau] payment portal" "taken immediately preceding" defendants' payment of the delinquent taxes. (*Id.* (citing Parcel Search Result).) Because the screenshot "shows a pre-filled 'installment payment amount,'" they argue "there is sufficient evidence" to create a jury question about defendants' knowledge of the payment plan. (*Id.*) But the screenshot only reinforces defendants' justification for paying the Goldsmiths' delinquent taxes— the parcel search result states in bold font "Delinquent Taxes Due as of 5/22/2017 2:58 PM (interest charged monthly) . . . Total $30,020.97." (Parcel Search Result.) Even assuming a jury could conclude defendants knew about the Goldsmiths' payment plan, no reasonable jury could conclude it establishes intent for purposes of their tortious interference claim. *See Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971) ("The absence of privilege or justification in the tort [of tortious interference] . . . is closely related to the element of intent."). And in any event, the Goldsmiths admit defendants paid their taxes as a precautionary measure, not to harm their relationship with Montgomery County. (Edwin Goldsmith Dep. at 99:19–100:15) ("I think [defendants] paid the taxes under a misimpression that if the taxes weren't paid, that someone could take the—take over the position of the taxing authority.")

B

Next, the Goldsmiths claim defendants are liable for abuse of process because they filed and prosecuted a mortgage foreclosure action against them in Montgomery County. (Goldsmiths' Resp. in Opp'n at 12.) To prove abuse of process, they must show defendants used a legal process against them "primarily to accomplish a purpose for

8

which it is not designed." *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. Ct. 1993) (citing Restatement (Second) of Torts, § 682).

When defendants paid the delinquent property taxes, they increased the Goldsmiths' monthly payment to $9,137.30. (Defs.' SOMF ¶¶ 19–22.) Because the Goldsmiths continued to submit payments of only $3,793.84, in December of 2018 defendants filed the foreclosure action. (Defs.' Mot. for Summ. J. at 7.) On this legitimate basis—mortgage default—no reasonable jury could find defendants liable for abuse of process. There is no record evidence defendants used proceedings "primarily to accomplish a purpose for which [foreclosure] is not designed," *Rosen*, 627 A.2d at 192, nor is there evidence they intended to extort the Goldsmiths "by means of attachment, execution or garnishment," *Barakat v. Delaware Cty. Meml. Hosp.*, No. 97-2012, 1997 WL 381607, at *2 (E.D. Pa. July 2, 1997). The Goldsmiths cannot show defendants pursued foreclosure "to coerce a desired result that [was] not the legitimate object of the process." *Schwartz v. OneWest Bank, FSB*, 614 F. App'x 80, 83 (3d Cir. 2015). Indeed, "there is no cause of action for abuse of process if [defendants], even with bad intentions, merely carr[y] out the process to its authorized conclusion." *Cameron v. Graphic Mgt. Associates, Inc.*, 817 F. Supp. 19, 21 (E.D. Pa. 1992) (citing *Shaffer v. Stewart*, 473 A.2d 1017, 1019 (Pa. Super. Ct. 1984)).

## C

The Goldsmiths' conversion and unjust enrichment claims are based on payments they claim they made but were neither applied to the loan nor returned to them. (Goldsmiths' Resp. in Opp'n at 13.)

1

To prevail on their conversion claim, the Goldsmiths must show deprivation of their property without their consent and without legal justification. *Gottesfeld v. Mechs. and Traders Ins.*, 173 A.2d 763, 766 (Pa. Super. Ct. 1961). The Goldsmiths concede "some of these payments were returned [] or applied to the loan." (Goldsmiths' Resp. in Opp'n at 13.) Therefore, the conversion claim can be premised only on payments defendants neither returned nor applied to the Goldsmiths' mortgage. But the Goldsmiths were not deprived of property with respect to any such payment:

> Q: [F]or the checks that added up to what you say is an approximate value of $60,000 and that those were submitted to [defendants], not applied and you say not returned to you, you didn't actually lose that money.
>
> A: No.
>
> Q: Correct?
>
> A: No, I did not lose that money. No, because the bank in essence canceled the checks.

(Edwin Goldsmith Dep. at 86:9–17.)

2

The same goes for their unjust enrichment claim. Here, the Goldsmiths must show "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008) (quoting *Limbach Co. LLC v. City of Philadelphia*, 905 A.2d 567, 575 (Pa. Commw. Ct. 2006)). Again, the parties agree all payments at issue were either applied to the Goldsmiths' mortgage, returned to them or "in essence canceled" by their bank.

10

(Goldsmiths' Resp. in Opp'n at 13); (Edwin Goldsmith Dep. at 86:9–17.)  Defendants did not retain any benefit from the Goldsmiths from these payments.

Finally, defendants are not liable for unjust enrichment or conversion with respect to the Goldsmiths' three trial period payments.  The mortgage modification offer, under which the Goldsmiths made the payments, states:

> It is agreed we will hold the Trial Period Plan payments in an account until sufficient funds are in the account to pay the oldest delinquent monthly payment. It is also agreed we will not owe interest on the amounts held in the account. If any money is left in this account at the end of the Trial Period Plan and the account qualifies for a Permanent Mortgage Modification, those funds will be deducted from amounts that would otherwise be added to the modified principal balance.

(Loan Modification Offer at 7, Defs.' Ex. L, Dkt. No. 85-16.)  Defendants applied the three payments to the Goldsmiths' account.  (Defs.' SOMF ¶ 29.)

D

The Goldsmiths next assert defendants violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law.  The gravamen of the claim is that defendants denied them a permanent loan modification agreement because they mailed it after the deadline to sign it had passed.  (Goldsmiths' Resp. in Opp'n at 15–18.)  To succeed, the Goldsmiths must show they

> (1) purchased or leased goods or services primarily for personal, family or household purposes; (2) [] suffered an ascertainable loss of money or property; (3) the loss occurred as a result of the use or employment by a vendor of a method, act, or practice declared unlawful []; and (4) [] justifiably relied upon the unfair or deceptive business practice when making the purchasing decision.

*Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021) (citing 73 Pa. Stat. and Cons. Stat. Ann. §§ 201-8, 201-9.2; *Schwartz v. Rockey*, 932 A.2d 885, 897 n.15 (Pa. 2007)) (internal quotation marks omitted).

11

Defendants contend the Goldsmiths have not shown they made a misrepresentation upon which the Goldsmiths reasonably relied. (Defs.' Reply at 9, Dkt. No. 91.) As an initial matter, the UTPCPL contains a catch-all provision prohibiting "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Stat. and Cons. Stat. Ann. § 201-2(4)(xxi). Therefore, the Goldsmiths need not show defendants made a misrepresentation or *intended* to deceive them to establish liability. *Gregg*, 245 A.3d at 648. Defendants concede as much, admitting "Plaintiffs are correct" that "they only need to prove [defendants] engaged in deception, which does not require proof of state of mind." (Defs.' Reply at 9.)

On February 25, 2019, defendants sent the Goldsmiths a temporary mortgage loan modification offer "which would have resolved Plaintiffs' past due status." (Defs.' SOMF ¶ 28.) The offer included three "trial period payments" of $5,291.99 and promised "[u]pon successful completion of the Trial Period Plan, we will send a Permanent Modification Agreement, which will require [your signature]." (Loan Modification Offer at 4–5.) The Goldsmiths signed the trial period modification plan on March 28, 2019 and made three timely payments of $5,281.99. (Defs.' SOMF ¶¶ 28–29.) In addition to resolving the Goldsmiths' "past due status," the permanent modification agreement would have, among other things, more than halved their interest rate (from 9.5 to 4.375 percent) and introduced a balloon payment due at maturity of the mortgage. *See* (Permanent Modification, Defs.' Ex. O, Dkt. No. 85-19); (Note, Goldsmiths' Ex. B, Dkt. No. 88-4 at 6).

The parties dispute whether, as promised, defendants sent the final loan modification agreement before the deadline to respond to it on July 21, 2019. The

12

Goldsmiths say they never received it.  (Goldsmiths' SOMF ¶ 101.)  Defendants claim they sent the agreement to the Goldsmiths in a letter dated July 3, 2019.  (Defs.' SOMF ¶ 30.)  But they offer no evidence that the letter was sent on that date other than the date on a printed copy of the letter.  Indeed, the deposition testimony they adduce in support of their assertion does not independently point to any date when defendants sent the letter.  *See* (Permanent Modification at 3); (Feezer Dep. at 212:16–23, 225:3–19).  More importantly, customer service notes associated with the Goldsmiths' account are contradictory:

> 07/02/2019: FINAL SLM MOD TO BE SENT VIA 2 DAY MAIL
>
> > NEED SIGNED MOD BACK BY 16-JUL-19, IN ADDITION TO ALL TRIAL PAYMENTS (AS APPLICABLE) BEING RECEIVED.
>
> 07/09/2019: REVIEWED THE CONTESTED LOANS, THE LOAN IS STILL CONTESTED HENCE REPROJECTED THE LOAN
>
> 07/26/2019: MODIFICATION PACKAGE MAILED VIA UPS

(Customer Service Notes, Goldsmiths' Ex. AT, Dkt. No. 88-5 at 101) (cleaned up).  On this record, defendants are not entitled to a presumption that the Goldsmiths received the letter containing the permanent loan modification agreement.  *See Geise v. Nationwide Life & Annuity Co. of Am.*, 939 A.2d 409, 423 (Pa. Super. Ct. 2007) ("[T]he party who is seeking the benefit of the [mailbox rule] presumption must adduce evidentiary proof that the letter was signed in the usual course of business and placed in the regular place of mailing."); *see also Paul v. Dwyer*, 188 A.2d 753, 756 (Pa. 1963) (explaining the rebuttable mailbox rule presumption applies to receipt, not mailing).  Viewing the record in the light most favorable to the Goldsmiths, a reasonable jury could conclude defendants deceived the Goldsmiths either because they never sent the

permanent loan modification agreement or sent it on July 26, five days after the deadline to respond. *See Gregg*, 245 A.3d at 652 (affirming the trail court's finding that a failure to "clearly and fully" explain the terms of a life insurance policy "created a likelihood of confusion or misunderstanding").

Finally, a reasonable jury could conclude the Goldsmiths suffered an "ascertainable loss" to the extent the permanent loan modification agreement was superior to their original mortgage. The Goldsmiths present various methods of calculating their loss derived from, among other things, differences in loan principal, term and interest rate. (Goldsmiths' Suppl. Br., Dkt. No. 122.) Although perhaps "difficult to ascertain," the Goldsmiths have done enough to show an "identifiable," "tangible loss" in support of their UTPCPL claim. *Compare In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 541 n.11 (M.D. Pa. 2021) (explaining "abstract 'benefit of the bargain'" damages, on their own, may not constitute ascertainable loss) *with Dibish v. Ameriprise Fin., Inc.*, 134 A.3d 1079, 1089 (Pa. Super. Ct. 2016) (finding a UTPCPL plaintiff is "entitled to the benefit of her bargain" and explaining that although fact finders must "consider the precise benefit expected," "there must remain [] flexibility in calculating actual damages." (citations omitted)).

### E

The Goldsmiths' fraud claim is based on the same facts as their UTPCPL claim. To establish common law fraud, they must show

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it [was] true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994) (citations omitted).

14

Defendants argue they sent the permanent modification agreement to the Goldsmiths, who failed to timely sign and return it. *See* (Defs.' Mot. for Summ. J. at 10–12). But for the reasons already explained, defendants are not entitled to a presumption they sent the Goldsmiths a final loan modification agreement in time for them to accept it. *See supra* section III.D. The Goldsmiths assert they reasonably relied on defendants' February 25, 2019 commitment to send them a permanent loan modification agreement, so long as they made three trial payments. (Goldsmiths' Sur-reply at 8, Dkt. No. 119.) And they adduce evidence defendants did not send the permanent modification agreement until July 26, five days after the deadline to respond. (Customer Service Notes, Goldsmiths' Ex. AT, Dkt. No. 88-5 at 101.) Defendants claim the Goldsmiths cannot show they intended to mislead them. (Defs.' Mot. for Summ. J. at 12.) But "[t]he existence of a party's intent to defraud generally presents a factual question for a jury." *Sphere Drake Ins. v. Zakloul Corp.*, No. 96-8123, 1997 WL 312217, at *8 (E.D. Pa. June 3, 1997) (citing *United States v. Thomas*, 610 F.2d 1166 (3d Cir. 1979)). On this record, a reasonable jury could conclude defendants intentionally denied the Goldsmiths an opportunity to accept the permanent loan modification.

Finally, the Goldsmiths have presented sufficient evidence from which a jury could conclude they suffered a "resulting injury" as measured by their "actual loss." *Speicher v. Rocket Mortg., LLC*, No. 22-4284, 2024 WL 21798, at *3–4 (E.D. Pa. Jan. 2, 2024) (citing *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983)). Should they prevail at trial, they would be entitled to "all pecuniary losses which result as a consequence of [their] reliance on the truth of [defendants']

15

representation[]" that a permanent loan modification agreement was forthcoming. *Id.* Defendants suggest harm to the Goldsmiths is speculative, (Defs.' Suppl. Br. at 5, Dkt. No. 121), but damages are unacceptably "speculative only if the uncertainty concerns the *fact* of the damages rather than the *amount*." *See Pashak v. Barish*, 450 A.2d 67, 69 (Pa. Super. Ct. 1982) (citations omitted). Here, a reasonable jury could conclude defendants denied the Goldsmiths the opportunity to accept a superior loan agreement and suffered a calculable injury as a result. (Goldsmiths' Suppl. Br. at 6–7.)

F

The Goldsmiths next assert defendants violated the Fair Debt Collection Practices Act. To prevail, the Goldsmiths must show "(1) [they are] a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Jensen v. Pressler & Pressler*, 791 F.3d 413, 417 (3d Cir. 2015). Defendants contend they cannot be liable for an FDCPA violation because they are not a "debt collector." (Defs.' Mot. for Summ. J. at 12–13.)

As an initial matter, the pro-forma language in defendants' correspondence stating "[t]his communication is from a debt collector" does not make them a "debt collector" under the statute. *Prince v. NCO Fin. Servs., Inc.,* 346 F.Supp.2d 744, 751 (E.D. Pa. 2004) ("[A]n entity may generally be a 'debt collector' without being a 'debt collector' in a specific situation.") Mortgage loan servicers are ordinarily not FDCPA "debt collectors" because the term does not include debt collection activity "concern[ing] a debt which was not in default at the time it was obtained." *See Zinetti v. Deutsche*

16

*Bank Natl. Tr. Co.*, No. 19-1279, 2022 WL 3081446, at \*7 (D. Del. Aug. 3, 2022) (quoting

15 U.S.C. § 1692a(6)(F)(iii)); *see also Adelson v. Ocwen Loan Servicing, LLC*, No. 20-

2204, 2023 WL 1305100, at \*7 (6th Cir. Jan 31, 2023) ("A mortgage servicer can be a

'debt collector' if it 'acquired a debt in default or has treated the debt as if it were in

default at the time of acquisition.'" (citations omitted)).  The Goldsmiths were not in

default when defendants began servicing the mortgage and defendants did not treat the

debt as defaulted until after 2015 when the Goldsmiths failed to pay property taxes.

(Defs.' SOMF ¶ 35); (Goldsmiths' SOMF ¶ 12.)

In response, the Goldsmiths argue "PHH Mortgage Corporation did not begin

servicing the loan until March 16, 2019, some eighteen [] months after the Defendants

claimed a default" and therefore claim defendant PHH became a "debt collector" under

the FDCPA.  (Goldsmiths' Sur-reply at 9.)  First of all, acquisition of debt after default

does not automatically render PHH a "debt collector" under the FDCPA.  *See Henson v.*

*Santander Consumer USA Inc.*, 582 U.S. 79, 87 (2017) ("[W]hile the [FDCPA] surely

excludes from the debt collector definition certain persons who acquire a debt before

default, it doesn't necessarily follow that the definition must include anyone who

regularly collects debts acquired after default.").  And it is undisputed that PHH

became the Goldsmiths' mortgage servicer via merger with Ocwen Loan Servicing,

LLC.  (Feezer Dep. at 10:10–23); (Defs.' SOMF ¶ 4.)  A mortgage servicer does not

transform into an FDCPA "debt collector" when it obtains a loan via merger.  *See*

*Mitchell v. Brock & Scott, PLLC*, No. 19-2225, 2022 WL 3290710, at \*7 (D. Md. Aug. 11,

2022) ("[C]ourts have routinely held that a person who acquires a debt via merger is not

a 'debt collector' under [the FDCPA].") (citing *Brown v. Morris*, 243 F. App'x 31, 34–35

17

(5th Cir. 2007)); *see also Pascal v. JPMorgan Chase Bank, Nat. Ass'n*, No. 09-10082, 2013 WL 878588, at \*4 (S.D.N.Y. Mar. 11, 2013) ("[S]uch defendant companies are not debt collectors under the FDCPA because, as a result of the merger or acquisition, they stand in the place of the original servicing company as Plaintiffs' loan servicer." (citations and internal quotation marks omitted)); *Bracken v. Bank of Am., N.A.*, No. 14-1814, 2014 WL 7369570, at \*5 (D.S.C. Dec. 29, 2014) (same).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.